UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 97-10991

ROLEX WATCH USA, INC.,

Plaintiff-Appellant,

versus

ROBERT MEECE, doing business as
American Wholesale Jewelry,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

October 21, 1998

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

In this appeal by Rolex Watch U.S.A., Inc., from the injunction it obtained in its trademark infringement action, the primary issue is whether Rolex is entitled to recover profits and attorney's fees from Robert Meece, doing business as American Wholesale Jewelry. We **AFFIRM** in part, **VACATE** in part, and **REMAND** for further proceedings.

I.

Because many of the facts are undisputed, the following is drawn largely from stipulated facts and the district court's findings.

Rolex Watch U.S.A., Inc., is the exclusive distributor in the United States of watches and products sold under the registered trademarks of Rolex, which include "Rolex", "Oyster", "President", "Crown Device", "Datejust", "GMT-Master", "Day-Date", "Oyster Perpetual", and "Submariner". The "Crown Device" is a crown, consisting of five prongs, with a ball at the top of each, and an oval underneath, depicting the base of the crown. The Rolex trademarks are used in connection with watches and/or watch bracelets and related products. As of the trial in early 1997, and with the exception of the registration for "Submariner" (registered in July 1993), all of these marks had become incontestable pursuant to 15 U.S.C. § 1065 (generally, registrant's right to use registered mark becomes incontestable after mark has been in continuous use for five consecutive years subsequent to date of registration).

Rolex advertises its watches extensively in national magazines, and the watches are sold by authorized dealers, known as official Rolex jewelers. Rolex watches are known by the purchasing public as being of high quality, and Rolex consumers are generally considered to be sophisticated. In addition, there is a substantial market for used Rolex watches.

A Rolex watch consists of the watch movement; the case (which holds the movement) and winding mechanism; the bezel (a ring which is pressure-fitted over the crystal to seal it to the watch case, and which serves a water-proofing function); the dial; and the bracelet (also referred to as the band), including the clasp which, when opened, expands the bracelet so that it will fit over the wearer's hand. The watches, which are available in a number of styles, are made of stainless steel, stainless steel and gold, and gold. They are also available with diamond dials and/or diamond bezels.

New Rolex watches have a Rolex tag and a green factory sticker on the back of the watch case. For genuine Rolex bracelets, the clasps bear the Rolex "Crown Device" trademark on the exterior of the clasp; the "Rolex" trademark, on the interior. The winding mechanism bears the "Crown Device", which also appears on the dial, along with the "Rolex" trademark and other trademarks, such as "Oyster Perpetual Datejust". The "Rolex" trademark is also stamped on the back of the bezels; therefore, that mark is not visible unless the bezel is removed.

Authorized Rolex dealers provide Rolex warranties with the sale of new Rolex products, and also provide services under the warranty. The warranty distributed with Rolex watches runs for one year from the date of purchase from an authorized Rolex dealer. Modification of Rolex watches by the addition or substitution of parts not provided or authorized by Rolex voids the Rolex warranty.

And, it is the policy of Rolex not to service its watches which have been modified with non-Rolex parts.

Meece, doing business as American Wholesale Jewelry, has been in business since 1979, with average gross annual sales of $4.2 million.  He sells parts designed for Rolex and other brands of watches, and also sells *new* Rolex watches, to which he adds non-genuine parts, such as diamond bezels.  Meece warrants his products for one year, and will repair any products returned to him within a year.

Meece is not affiliated with Rolex, and his activities are not sanctioned or authorized by Rolex.  His advertising is directed exclusively to the retail jewelry store trade, and he sells only to jewelers.

Meece's advertising brochures indicate that his replacement parts are not genuine Rolex parts; that he is not affiliated with Rolex; and that the addition of non-Rolex parts will void the Rolex warranty.  However, he stipulated that the parts he sells do not bear any markings indicating that he is the source; and that he has not disclosed on invoices or tags either that his non-Rolex parts are not authorized by Rolex or that their addition voids the Rolex warranty.

As indicated, Meece deals with jewelers, *not* with the public. Indeed, he testified that he makes it a point to "hide from the public" and "avoid[s] them like the plague".  In a typical

- 4 -

transaction, an ultimate consumer requests products or services from a retail jeweler, who in turn places an order with Meece. The jeweler receives the product from Meece and delivers it to the ultimate consumer.

But, Meece stipulated that he does not control how his non-Rolex parts or watches containing non-Rolex parts are sold to ultimate consumers; and that he has no way of knowing, when a jeweler places an order, whether there is an actual consumer. The district court found that subsequent potential purchasers of "reconstructed" watches, discussed *infra*, may not have the benefit of dealing with a jeweler or viewing Meece's advertising brochures.

Rolex first became aware of the sale of replacement parts by Meece in the early 1980s. It protested Meece's use of Rolex trademarks in his advertising, and demanded that he disclose in his advertising materials, as well as on tags and invoices, that his parts were not manufactured by Rolex and that their addition to Rolex watches voided the Rolex warranty. Meece responded that his "invoices [were] explicit, and buyers [were] reminded that altering the manufacturer's product, or use of unauthorized parts or accessories void[ed] the manufacturer's warranty". Additional correspondence between Rolex and Meece from December 1990 through March 1994 reveals further protests by Rolex and further assurances by Meece.

In 1994, Meece began distributing advertising which prominently pictured Rolex watches, and in which he offered to convert a used stainless steel Rolex watch into a new gold watch, using non-genuine parts. In these advertising materials, Meece used Rolex trademarks to identify non-genuine parts, and pictured an imitation crown design on non-genuine bracelets, in the same location as the Rolex "Crown Device" appears on genuine Rolex bracelets.

In response to this advertising, a Rolex investigator furnished a used stainless steel Rolex watch to a retail jeweler, who in turn asked Meece to convert that used watch to a Rolex 18 karat gold "Submariner". Meece returned the altered watch to the jeweler with an invoice for $5,520. Rolex discovered that the watch no longer contained the original movement; instead, a much older movement, in need of repair, had been substituted.

On a second occasion, the jeweler ordered for Rolex's investigator one of Meece's 18 karat gold "Submariner" watches, as shown in Meece's advertisement, but without providing a watch for conversion. In response to that order, the jeweler received an 18 karat gold "Submariner" watch with a used genuine Rolex movement, a non-genuine bracelet, bezel, and case, and a genuine, but refinished, Rolex dial. The watch arrived in a genuine Rolex leather box bearing Rolex trademarks.

Moreover, shortly before trial in early 1997, Rolex's investigator purchased a new Rolex watch from Meece, which had been "enhanced" with the addition of non-genuine parts (diamond bezel and diamond dial). The watch had the green Rolex factory sticker on the back of the case; and it included a Rolex tag, a Rolex warranty (in a foreign language), and Rolex instructional materials, which Meece admitted he had copied and surrounded with a border of Rolex "Crown Device" designs.

Neither the watch, nor the accompanying literature, contained any markings to indicate the presence or source of non-genuine parts or any disclosures that Rolex would not warrant or service the watch. When confronted at trial with the watch, Meece testified initially that he was unaware of Rolex watches being shipped in such a manner; but later, he acknowledged that he was sending his products with the copied instruction sheet "to everyone" and shipped such enhanced new watches "with everything it came with", including warranties, tags, and boxes.

Meece stipulated that the quality of his non-genuine Rolex replacement parts is not as good as genuine Rolex parts; that he has had quality problems when bracelets have fallen apart in two instances; that his bracelets are not the same weight as genuine Rolex bracelets; and that some of the diamonds he has used were of "poor quality". Moreover, he testified that he does not pressure-test watches after installing his non-genuine bezels.

At trial, in their briefs, and at oral argument, the parties have not been consistent in describing the types of Meece products at issue, which has caused considerable difficulty. Likewise, in its opinion, the district court referred to Meece's products as "individual replacement parts" and, interchangeably, as "reconstructed watches", "converted watches", and "modified Rolex watches". For purposes of clarity, we will refer to the products as follows:

1. **Parts**. The parts at issue are non-genuine parts (bezels, bracelets, buckles, clasps, and cases) designed solely for use on genuine Rolex watches, which Meece sold separately from complete watches. Although the bracelets are stamped "Made in Italy", none of the parts were marked to indicate their source was Meece or American Wholesale Jewelry.

2. **Enhanced New Watches.** This category consists of *new*, genuine Rolex watches, which Meece purchased and then "enhanced" by substituting non-genuine parts, such as diamond bezels and/or bracelets. It also includes *new*, genuine Rolex watches from which Meece removed the dials, drilled holes in them, added diamonds, refinished the dials, and then re-installed them on the watches.

Rolex claims that it first learned of such activities during discovery, when Meece produced invoices reflecting over $1.8 million in sales of *new* Rolex watches which had been enhanced to imitate more expensive Rolex watches by the substitution of lesser-

quality, non-genuine parts.  In its appellate brief, Rolex refers to this category as "reconstructed" watches, and asserts that the district court's injunction prohibits Meece from selling them.  At oral argument, Rolex referred to this category of watches as "brand new" genuine Rolex watches "enhanced" by Meece with non-genuine parts, and continued to maintain that the sale of such watches is enjoined.

The district court's findings of fact and conclusions of law do not expressly address this discrete category of watches. Instead, as discussed *infra*, the court appears to have used the term "reconstructed" to refer to both *old and new* Rolex watches to which Meece added or substituted non-genuine parts.

In his appellate brief, Meece maintains that the injunction does not prohibit the sale of *new* Rolex watches enhanced with non-genuine parts.  According to Meece, enhancement of new watches does not constitute conversion of watches, and he does not "reconstruct" a watch when he adds replacement parts.  At oral argument, Meece repeated his assertion that a "reconstructed" watch, within the meaning of the injunction, is the same as a "converted" watch, discussed below.  As explained *infra*, we interpret the injunction as prohibiting, *inter alia*, the sale of enhanced new watches.

3.  **Converted Used Watches.**  This category includes *used* Rolex watches which Meece "converted" by recasing genuine old Rolex movements in non-genuine Rolex cases and substituting other non-

genuine parts. The district court found that Meece had abandoned the practice of performing complete conversion services.

As noted, Meece asserted at oral argument that there is no difference between "converted" and "reconstructed" watches, and that this is the only category of watches to which the district court's injunction applies. As also noted, the district court appears to use the term "reconstructed" to refer to both *old and new* watches to which Meece has added parts, and the term "converted" to refer to Meece's practice of taking a stainless steel Rolex watch and adding non-genuine gold replacement parts "to produce a reconstructed watch that simulates a Rolex Submariner or other watch".

4. **Non-Genuine Bracelets with Genuine Rolex Clasps.** This category consists of non-genuine bracelets on which Meece installed the customer's original, genuine Rolex clasp, bearing Rolex trademarks. This activity was enjoined by the district court; Meece claims that he no longer engages in it.

The Meece products having been defined, we can turn to the issues presented in district court. In its complaint, Rolex claimed, *inter alia*, that Meece's activities constituted trademark infringement *and trademark counterfeiting*, in violation of 15 U.S.C. § 1114(1); false designation of origin, false descriptions, and false representations, in violation of 15 U.S.C. § 1125(a); and unfair competition and dilution under Texas law. Meece countered

with affirmative defenses of laches, acquiescence, and estoppel, as well as counterclaims premised on state law.

Following a hearing on Rolex's motion for a preliminary injunction, the district court, in August 1995, enjoined Meece and American Wholesale Jewelry from performing any services which would involve injecting into commerce a watch bearing a Rolex mark which is reconstructed with generic replacement parts and which simulates a Rolex watch. The court denied such relief with respect to Meece's sale of individual replacement parts and with respect to Rolex's claim of likely confusion resulting from the sale of watches that resembled a genuine Rolex watch — they had the name "Geneve" on the dial and an emblem resembling a crown on the bracelet. The preliminary injunction noted that Meece had converted only six used Rolex watches, two of which had been sold to Rolex's investigator, and that Meece was no longer advertising such conversion services.

A two-day bench trial was held in February 1997. Rolex sought an injunction (1) prohibiting Meece's sale of enhanced new watches; (2) requiring Meece to identify the source of his replacement parts by engraving the bracelet clasp, by placing disclosures on tags, labels, and invoices accompanying non-genuine parts, and by clarifying the disclaimer in his promotional materials; and (3) requiring Meece to obtain statements from his jeweler customers that the jewelers' customers had been advised of the non-genuine nature of the replacement parts. Rolex requested profits and

attorney's fees with respect to the enhanced new and converted used Rolex watches and the non-genuine bracelets with genuine Rolex clasps.

In August 1997, the district court entered findings of fact and conclusions of law and issued a final judgment and permanent injunction. It rejected Meece's claims of laches, acquiescence, or estoppel; and held that Rolex had established a "substantial likelihood of confusion" regarding Meece's sale of "reconstructed" watches:

> The reconstructed Submariner watch bears a high degree of similarity to a completely genuine Rolex watch and a prospective purchaser of the watch would likely confuse the reconstructed watch with a genuine Rolex. American Wholesale's name does not appear on the generic parts. Also, the internal markings on the parts, such as "made in Italy", would not dispel the likelihood of confusion on a completely reconstructed watch.

> From the perspective of secondary purchasers, a watch reconstructed with generic parts from American Wholesale, bearing a Rolex trademark, would create a substantial likelihood of confusion.... Rolex faces a substantial threat of harm in the face of sales of such reconstructed watches by Meece.

Accordingly, Meece was enjoined from

> performing any services which would involve injecting into commerce a watch bearing a Rolex mark which is reconstructed with generic replacement parts and which simulates a Rolex Submariner or other Rolex watch. For example, [Meece] is enjoined from receiving, or using from stock, stainless steel or other Rolex watches or movements and reconstructing them with generic parts into watches simulating a Submariner or other Rolex watch.

In addition, the district court found that, although Meece's non-genuine bracelets were marked "Made in Italy" and "[a] sophisticated Rolex consumer would likely be aware that the band was not a genuine Rolex band", "the likelihood of confusion for secondary purchasers increases by using the original [genuine] clasp on the replacement band". Therefore, it enjoined Meece from "selling replacement bands to customers with the consumers' original clasps bearing the Rolex mark substituted onto the replacement band". And, the court enjoined Meece from "accompanying modified Rolex watches with copies of instructions bearing the Rolex mark".

On the other hand, the court found that Meece's "individual replacement parts do not pose the same potential for confusion as a completely reconstructed watch"; and that "the mark used by Meece [on non-genuine bracelet clasps] is not sufficiently similar to be likely to cause confusion with the Rolex mark". Moreover, it concluded that Meece's sale of individual Rolex replacement parts did not constitute contributory infringement, stating that there was "insufficient evidence to find that buyers of [Meece's] parts are using the parts to create simulated Rolex watches to infringe upon Rolex's trademarks"; and that the evidence did not establish "that Meece is inducing others to infringe or that he knows that he is selling replacement parts to people who are using the parts to make reconstructed, infringing watches".

Likewise, the court refused Rolex's request to require disclosure by Meece by engraving parts or on tags, labels, or invoices, and refused to enjoin Meece's use of Rolex trademarks to identify replacement parts in his advertising materials. The court concluded that, "[a]s long as it is clear to the purchaser that the replacement part is not an authentic Rolex part, ... there is no reason to enjoin [Meece] from stating that the replacement part fits a particular Rolex product".

Finally, the court held that Rolex was not entitled to an award of Meece's profits because "profits derived from the sale of converted infringing watches [were] *de minimis*"; and that, because Meece's infringing conduct was not deliberate, attorney's fees would not be awarded Rolex. (The state law claims by Rolex and Meece were dismissed.)

## II.

Meece does not challenge the injunction, including the prohibition against "performing any services which would involve injecting into commerce a watch bearing a Rolex mark which is reconstructed with generic replacement parts and which simulates a Rolex Submariner or other Rolex watch". He contends, however, as discussed throughout, that the prohibition does not apply to his sale of enhanced new watches. And, not at issue is Meece being enjoined from "selling replacement bands to customers with the consumers' original clasps bearing the Rolex mark substituted onto

the replacement band" and from "accompanying modified Rolex watches with copies of instructions bearing the Rolex mark".

On the other hand, Rolex contends that the district court erred (1) by failing to find that Meece's enhanced new watches, converted used watches, and bracelets with genuine Rolex clasps were counterfeit and by failing to accordingly award treble profits and attorney's fees; (2) by failing to find that Meece was a deliberate infringer and by failing to accordingly award Rolex profits and attorney's fees; (3) by finding that Meece's sale of individual parts did not constitute contributory infringement; (4) by not enjoining Meece's use of his mark on non-genuine bracelets; (5) by not requiring disclosures with respect to Meece's sales of individual parts; and (6) by not enjoining Meece's use of Rolex trademarks to describe individual parts in his advertising materials.

"We review the district court's decision whether to grant or deny an injunction and the scope and form of the injunction for an abuse of discretion." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 550 (5th Cir. 1998). Findings of fact are reviewed for clear error; conclusions of law, *de novo*. FED. R. CIV. P. 52(a); *Pebble Beach*, 155 F.3d at 537; *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 196 (5th Cir. 1998).

A.

Concerning the underlying liability required before profits and attorney's fees can be awarded, the Lanham Act provides in pertinent part:

> (1) Any person who shall, without the consent of the registrant—
>
> > (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to *cause confusion*, or to cause mistake, or to deceive ...
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided....

15 U.S.C. § 1114(1)(a) (emphasis added). As noted, the district court's conclusion that Meece violated § 1114(1)(a) was based on finding that, "[f]rom the perspective of secondary purchasers, a watch reconstructed with generic parts from American Wholesale, bearing a Rolex trademark, would create a substantial likelihood of confusion".

Remedies for violation of § 1114(1)(a) are found in 15 U.S.C. §§ 1116 (injunctive relief), 1117 (profits, damages, costs, attorneys' fees), and 1118 (destruction of infringing articles). At issue is § 1117.

Section 1117(a) provides, in pertinent part, that a successful plaintiff is entitled,

> subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. *The court in exceptional cases may award reasonable attorney fees to the prevailing party.*

(Emphasis added.)

Our court has considered the following non-exclusive list of factors in determining whether an award of profits under § 1117(a) is appropriate:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Pebble Beach*, 155 F.3d at 554. *See also George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir.) (to recover *profits* under § 1117(a), the "plaintiff must prove that an infringer acted with willful deception"), *cert. denied*, 506 U.S. 991 (1992); *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996) ("In order to recover an accounting of an infringer's profits, a plaintiff must prove that the infringer acted in bad faith"); *Lindy Pen Co., Inc. v. Bic*

*Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir.) ("Willful infringement carries a connotation of deliberate intent to deceive"), *cert. denied*, 510 U.S. 815 (1993); *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 968 (D.C. Cir. 1990) ("an award based on a defendant's profits requires proof that the defendant acted willfully or in bad faith"); *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 849 F.2d 1012, 1015 (6th Cir. 1988) ("For a court to order an accounting ..., bad faith must be shown"); *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 585 (5th Cir. 1980) ("district court properly ordered [defendant] to account to the plaintiffs for the profits it earned from its willful infringement").

Similarly, § 1117(a) expressly permits *an award of attorney's fees* only in "exceptional cases". "[T]he exceptional case is one in which the defendant's trademark infringement can be characterized as malicious, fraudulent, deliberate, or willful, and ... it has been interpreted by courts to require a showing of a high degree of culpability". *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1305 (5th Cir. 1997) (internal quotation marks and citation omitted); *see also* *Pebble Beach*, 155 F.3d at 555-56.

But, for use of a counterfeit mark, § 1117(b) provides that,

> [i]n assessing damages under subsection (a) of
> this section, the court *shall, unless the
> court finds extenuating circumstances*, enter
> judgment for three times such profits or

- 18 -

> damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title ... *that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark* (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services....

(Emphasis added.)

Thus, under subsection (a), for willful or deliberate infringement, the district court may award profits "subject to the principles of equity"; and, in "exceptional cases", it may award attorney's fees. But, for counterfeiting cases, under subsection (b), the court "shall" award treble profits and attorney's fees, "unless the court finds extenuating circumstances".

As noted, the district court concluded that Rolex was not entitled to an award of profits under § 1117(a), because the "profits derived from the sale of converted, infringing watches [are] *de minimis*" and because Meece did not engage in deliberate infringement. But, it did not address, even by implication, whether Meece's activities constituted trademark counterfeiting and, therefore, did not consider whether Rolex was entitled to the remedies available under subsection (b), to include whether there were extenuating circumstances within the meaning of that subsection.

Rolex contends that the district court clearly erred by finding that Meece's profits were *de minimis*; that it erred by

failing to address, under § 1117(b), whether Meece's activities constituted trademark counterfeiting and by failing, as a result, to award treble profits and attorney's fees; and that it was entitled to an award of profits and attorney's fees under § 1117(a), because Meece's activities at least constituted deliberate infringement.

1.

The Lanham Act "expressly confers upon the district judges wide discretion in determining a just amount o[f] recovery for trademark infringement". *Martin's Herend Imports*, 112 F.3d at 1304. "The purpose of section 1117 is to take all the economic incentive out of trademark infringement". *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) (internal quotation marks and citations omitted); *see also* *Maltina*, 613 F.2d at 585 (agreeing with reasoning of Ninth Circuit that "awarding an accounting [of profits] would further Congress' purpose in enacting [§ 1117] of making infringement unprofitable"). "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

Rolex produced Meece's invoices reflecting enhanced new watch sales of $1,813,748; "convert/converted" used watch sales of $26,475; and sales of non-genuine bracelets with genuine Rolex clasps of $5,940.

Meece testified that he had a gross profit of 13 percent and an overhead of seven percent, resulting in a before-tax profit of six percent. According to Meece, that six percent is comprised of five to five-and-one-half percent on accessories and less than one percent on new watches. He testified that his gross profit on accessories was between 20 and 25 percent; but, in his post-trial brief, he claimed that he had a 25 percent profit on diamond bezels, dials, and bands. Meece produced no documentary evidence to support those figures, and offered no evidence as to the nature or amount of his overhead expenses. Although he listed his financial statements as exhibits, he did not introduce them into evidence.

Rolex asserts that Meece's testimony is insufficient to support any deductions from sales and that it is therefore entitled to an award of the entire $1,846,163 in sales, trebled, because, as discussed *infra*, it claims that the goods were counterfeit. Alternatively, based on Meece's testimony, Rolex calculates Meece's profits as follows:

$15,819.08 - 1% profit on $1,581,908 (new watches)

$57,960.00 - 25% profit on $231,840 (Meece parts added
             to new watches)

$ 6,618.75 - 25% profit on $26,475 (converted used watches)

$ 1,485.00 - 25% profit on $5,940 (Rolex clasps on non-
             Rolex bands)

$81,882.83 - TOTAL

Rolex asserts that, even accepting Meece's profit percentages, this amount is not *de minimis*.

As stated, Meece was enjoined from "performing any services which would involve injecting into commerce a watch bearing a Rolex mark which is reconstructed with generic replacement parts and which simulates a Rolex Submariner or other Rolex watch". Rolex does not challenge that portion of the injunction, which it interprets as prohibiting, *inter alia*, Meece's sale of enhanced new watches. Meece maintains, however, that the district court found no counterfeiting because it found no infringement as to enhanced new watches. According to Meece, the district court "did not enjoin the sale of watches that have merely been enhanced or repaired". Meece maintains that he does not "reconstruct" a watch when he adds parts, and that a "reconstructed" watch is the same as a "converted" watch.

The injunction would seem to encompass both enhanced new watches *and* converted used watches, because both types contain generic replacement parts and simulate genuine Rolex watches. And, both enhanced new watches and converted used watches seem to pose the same threat of harm to Rolex from the perspective of secondary purchasers; the district court found that "a watch reconstructed with generic parts from American Wholesale, bearing a Rolex trademark, would create a substantial likelihood of confusion".

But, in that Meece's sales of enhanced new watches exceeded $1.8 million and his profits from such sales exceeded $80,000, it is difficult to square that interpretation with the district court's finding that Meece's "profits derived from the sale of converted, infringing watches [are] *de minimis*".

Considering all of the evidence and, especially, the district court's findings regarding the likelihood of confusion with respect to secondary purchasers, we interpret the injunction as prohibiting the sale of enhanced new watches *and* converted used watches. That interpretation is also supported by case law interpreting the Lanham Act as prohibiting a party from making changes in integral parts of a product and then selling the modified product under the original trademark without full disclosure.

For example, in **Bulova Watch Co. v. Allerton Co.**, 328 F.2d 20 (7th Cir. 1964), the defendant removed genuine Bulova watch movements, bearing the Bulova trademark on the dial, from their original Bulova cases and placed the movements in diamond-decorated cases. *Id*. at 21. The defendant then sold the watches under the trade name "Treasure Mates". *Id*. The Seventh Circuit affirmed the district court's finding that the recasing operation resulted in "a different product"; and held that the district court erred by not enjoining the use of the Bulova trademark on the recased watches. *Id*. at 23-24. As noted, the bezel on a Rolex watch is a necessary and integral part of the watch and serves a water-proofing

function.  Obviously, bracelets and dials are also necessary, integral parts:  a watch cannot be worn without a bracelet; and, the watch cannot serve its purpose of timekeeping without a dial.

Including Meece's sales of enhanced new watches, Rolex proved infringing sales of $1,846,163; based on Meece's testimony, his profits on those sales totaled $81,882.83.  We reject Rolex's contention that Meece produced insufficient evidence to establish deductions from gross sales.  But, the district court clearly erred by finding those profits *de minimis*.

Nevertheless, it does not automatically follow that Rolex is entitled to treble profits.  As stated, under § 1117(a), an award of profits requires proof of willful or deliberate infringement, and the decision whether to award profits is subject to equitable considerations.  And, under § 1117(b), treble profits are available *only* if the activity involves trademark counterfeiting, and the court does not find extenuating circumstances.  "Under either subsection, awards are never automatic and may be limited by equitable considerations".  **Intel**, 6 F.3d at 620 (internal quotation marks and citations omitted).

## 2.

For the seizure remedy for counterfeit goods, a "counterfeit mark" is defined as

> (i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale,

> or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or
>
> (ii) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 380 of Title 36....

15 U.S.C. § 1116(d). Similarly, § 1127 defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark". 15 U.S.C. § 1127.

Again, Rolex claims that Meece's enhanced new watches, converted used watches, and bracelets with genuine Rolex clasps are counterfeit. In selling those items, Meece did not copy or imitate Rolex's trademarks; quite to the contrary — those items *bear original Rolex trademarks*. For example, Rolex asserts that, once Meece added non-genuine parts to genuine Rolex watches bearing original Rolex trademarks, the watches on which those trademarks appear are no longer Rolex's product and are, therefore, counterfeit within the meaning of §§ 1116(d) and 1127. Accordingly, it contends that, under § 1117(b), it is entitled to treble profits and attorney's fees.

Because Meece's items in question bore original Rolex trademarks, rather than imitations or copies of those trademarks, they would not seem to be "counterfeit" in the literal sense. Nevertheless, other courts have found that similar uses of genuine trademarks constitute counterfeiting. In ***Westinghouse Elec. Corp.***

*v. General Circuit Breaker & Electric Supply, Inc.*, 106 F.3d 894 (9th Cir.), *cert. denied*, ___ U.S. ___, 118 S. Ct. 155 (1997), the defendant sold used Westinghouse circuit breakers after reconditioning them and attaching labels bearing the Westinghouse trademark. The Ninth Circuit noted that "[t]he original Westinghouse labels are not themselves 'counterfeits' in the literal sense", but concluded, nevertheless, that the products were counterfeit. *Id*. at 900. "When an original mark is attached to a product in such a way as to deceive the public, the product itself becomes a 'counterfeit' just as it would if an imitation of the mark were attached." *Id*.

Likewise, in *General Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir. 1989), the Seventh Circuit concluded that the defendant's placement of non-General Electric products in boxes that General Electric had stamped with its registered "GE" trademark constituted trademark counterfeiting. And, similarly, in *Intel*, 6 F.3d at 619-20, the Ninth Circuit concluded that the defendant's practice of purchasing genuine Intel math coprocessors and relabeling and selling them as faster and more expensive coprocessors constituted counterfeiting. "When the chip genuinely from Intel was marked with a speed designation Intel would not have given it, the chip became a counterfeit Intel 80287-10 instead of a true Intel 80287-6." *Id*. at 620. *See also* *Joy Manufacturing Co. v. CGM Valve & Gauge Co., Inc.*, 730 F. Supp. 1387, 1396 (S.D. Tex. 1989)

(reconditioned valves sold under plaintiff's trademark found counterfeit).

There is considerable evidence that Meece's activities with respect to the items in issue constitute trademark counterfeiting. For example, new, genuine Rolex watches were modified by Meece with non-genuine parts to make them resemble more expensive Rolex watches. Although Rolex was still the source of the watches, it was not responsible for the non-genuine diamond bezels added by Meece, or for refinishing and placing diamonds in the genuine Rolex dials, or for any diamonds Meece added to the bracelets. Rolex did not perform or authorize the modifications, and its warranty was voided by Meece's activities. Meece, not Rolex, stood behind the watches; but the trademark suggested otherwise.

In this regard, Rolex introduced evidence that Meece distributed enhanced new watches without any markings or disclosures that would reach ultimate consumers or secondary purchasers; and that the watches contained the Rolex factory seal and the Rolex tag and were distributed in genuine Rolex boxes, with winding instructions copied from a Rolex booklet. Meece stipulated that he does not control how watches containing non-Rolex parts are sold to the ultimate consumer; and that, when he sells to retailers, he has no way of knowing if there is an actual consumer.

Accordingly, we must remand this action for the district court to determine whether Meece's use of Rolex trademarks on the

enhanced new watches, converted used watches, and non-genuine bracelets with genuine Rolex clasps caused them to be "counterfeit" within the meaning of §§ 1116(d) and 1127; and, if they were, it should, pursuant to § 1117(b), award profits (trebled) and attorney's fees to Rolex, unless it finds "extenuating circumstances".

3.

In addition, Rolex asserts that it is otherwise entitled to an award of profits and attorney's fees under § 1117(a), because Meece's activities at least constituted deliberate infringement. In finding no deliberate infringement, the district court stated that Meece "attempted to 'ride the line' but did not intend to cross it". We review this finding for clear error.

Rolex contends that the following evidence proves deliberate infringement: (1) Meece's false representation that he complied with all Rolex requests for disclosures as to individual replacement parts; (2) his substitution of an older Rolex movement when converting the used stainless steel Rolex watch submitted by Rolex's investigator; (3) his sale of over $1.8 million in enhanced new Rolex watches accompanied by the Rolex warranty (which Meece knew was void), the Rolex factory sticker, and the Rolex tag; (4) his sales of enhanced new watches accompanied by copied Rolex instruction sheets with a border of Rolex "Crown Device" designs; (5) his sale of enhanced new Rolex watches in original Rolex boxes;

(6) his sale of enhanced new Rolex watches without any disclosure to consumers as to the presence or origin of the non-genuine parts; (7) his repeated use of marks resembling the Rolex "Crown Device" mark, including a five-prong crown displayed in his catalog years after he allegedly discontinued use of that design; (8) his use of Rolex trademarks ("President", "Oyster", etc.) to identify his non-genuine watch parts, before and after suit was filed; (9) his advertisement of his conversion services for over a year after entry of the preliminary injunction, which Meece understood as enjoining such services; and (10) his placement of genuine Rolex clasps, bearing the Rolex trademarks, on non-genuine bracelets. Rolex posits that there is no explanation for Meece's conduct other than to profit from the use of Rolex marks in a manner that deceives consumers, takes sales away from Rolex, and damages its reputation.

Rolex maintains that, in other cases, similar activities have been found to constitute deliberate infringement. It cites *Joy Manufacturing Co. v. CGM Valve & Gauge Co., Inc.*, 730 F. Supp. 1387 (S.D. Tex. 1989), where the defendant used unauthorized nameplates bearing the plaintiff's mark on valves that defendant refurbished to look like new, and failed to mark the valves as used or reconditioned. *Id*. at 1391. The court found the conduct willful, entitling plaintiff to trebled profits under § 1117(a), and a fee award under the exceptional case provision. *Id*. at 1395-96.

The conduct of the defendant in *Joy* was much more egregious than Meece's. In *Joy*, the court found that, as a result of other lawsuits, the defendant was fully aware that its practices were unlawful and that, even after being enjoined from such acts in a number of cases, the defendant continued to use counterfeit nameplates of other valve manufacturers on its reconditioned valves.

Rolex also relies on *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1384-85 (9th Cir. 1984), where the defendants sold genuine Sealy mattresses together with non-Sealy foundations with identical fabric covering. The combined mattress and foundation appeared to be a matched set, and the defendants advertised the product as a Sealy mattress and matching foundation. There was evidence that retail salesmen made no effort to correct consumers' mistaken impressions that the foundation was a Sealy product. The Ninth Circuit affirmed the district court's finding the conduct to constitute willful and deliberate, bad faith infringement, justifying an award of attorney's fees. The court noted that "[t]here was substantial evidence tending to show that [defendants] manufactured and sold their look-alike foundations deliberately to deceive consumers and to take advantage of Sealy's brand identification". *Id*. at 1384. Here, there is no evidence that Meece intended that his products would be passed off as Rolex products, and his advertising indicated that his products were not

Rolex products and that American Wholesale was not affiliated with Rolex.

As the district court noted, Rolex and Meece had co-existed for over ten years. Meece advertised and sold his products only to retail jewelers, not to ultimate consumers. In his advertising materials, he made efforts to disclose to his customers (retail jewelers) that he was not affiliated with Rolex and that the addition of his parts to genuine Rolex watches voided the Rolex warranty. There is very little evidence that Meece made a concerted effort to palm off his products to his customers (retail jewelers) or to ultimate consumers as Rolex products. Accordingly, we conclude that the district court did not clearly err by finding no deliberate infringement. As a result, it did not err by refusing to award profits and attorney's fees under § 1117(a).

## B.

Rolex maintains that the district court erred by not finding that Meece's sales of unmarked non-genuine parts designed to fit Rolex watches constituted contributory infringement. In conjunction, it urges that Meece should have been enjoined to include disclosures to ensure that such parts are not being used for infringement purposes by his customers. The court ruled that the evidence did not support finding "that Meece is inducing others to infringe or that he knows that he is selling replacement parts

- 31 -

to people who are using the parts to make reconstructed, infringing watches".

The doctrine of contributory infringement is discussed in *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54 (1982) (emphasis added):

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, *or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.*

### 1.

Accordingly, Meece is liable for contributory infringement by distributing parts if he "continue[d] to supply [his parts] to one whom [he knew] or ha[d] reason to know is engaging in trademark infringement". *Id*. at 854. Rolex points to Meece's admissions that his replacement parts are made to fit Rolex watches and that he knows of no other watch that they fit; and that, even with his 15 years' experience, Meece could be fooled as to whether a Rolex watch contains non-genuine parts. Rolex asserts that, accordingly, Meece had reason to know that his non-genuine parts, designed to fit only Rolex watches, were destined to end up in infringing watches.

The district court did not clearly err by finding no contributory infringement. There was no evidence that Meece sold large quantities of parts to any single retailer. Instead, he sold only one or, at most, a few parts at a time to numerous jewelers. He testified that there was no group of jewelers or any particular jeweler who purchased a large number of replacement parts. Although Meece had no control over what the jewelers did with the parts he sold to them, there is no evidence that he continued to supply parts to jewelers he either knew, or had reason to know, were engaging in trademark infringement.

2.

In any event, Rolex asserts that the district court erred by not requiring adequate disclosures to identify non-genuine parts, claiming that disclosures are necessary to prevent contributory infringement. Rolex urges that Meece should disclose on tags and invoices that his replacement parts do not originate with Rolex and that Rolex will not guarantee or service watches containing such parts. And, because tags and invoices may be discarded by the jewelers to whom Meece sells the parts, Rolex maintains that Meece should also obtain statements from jewelers advising that they have disclosed to the jeweler's customers (ultimate consumers) the same information as disclosed to the jewelers on Meece's tags and invoices. Rolex asserts that permanent engraving of Meece bracelets could be accomplished inexpensively, and that statements

from jewelers regarding disclosures to consumers could be easily accomplished.

Meece responds that most of the requested disclosures already appear in his advertising materials, warranties, and invoices; that disclosing on tags that his replacement parts do not originate with Rolex and that Rolex will not guarantee or service watches containing such parts is "impractical and impossible due to the volume of parts sold, the size and shape of the parts, and the difficulty in attaching a document to a dial or link"; and that engraving his non-genuine bracelets is impractical, because he obtains them from different suppliers, and it would destroy the value of the jewelry. He contends further that an injunction limiting the sale of replacement parts to jewelers who furnish written statements that they have disclosed to their customers that Meece's replacement parts do not originate with Rolex and that the addition of such parts voids the Rolex warranty, is impractical, because his orders are taken over the telephone and shipped to jewelers; and that such a requirement would create more bookkeeping duties, "as he would have to match each statement to the order to which it relates", and he fills approximately 3,500 orders per year. He asserts also that requiring a written statement in advance of shipping would encourage customers to buy elsewhere to avoid both the trouble of providing written statements and the attendant delays in shipping.

Because the no contributory infringement finding is not clearly erroneous, the district court did not err by not requiring such disclosures.

## C.

Next, Rolex contends that the district court erred by not finding that Meece's mark on non-genuine bracelet clasps is likely to cause confusion with the Rolex "Crown Device" mark, which appears on the clasps of genuine Rolex bracelets.

Likelihood of confusion is a question of fact; we review only for clear error. *E.g.*, *Pebble Beach*, 155 F.3d at 537; *Elvis Presley Enterprises*, 141 F.3d at 196; *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992).

> In determining whether a likelihood of confusion exists, this court considers the following nonexhaustive list of factors: (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion.... No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these "digits of confusion".... In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists.

*Elvis Presley Enterprises*, 141 F.3d at 194; *see also* *Pebble Beach*, 155 F.3d at 543. An eighth factor, the degree of care employed by consumers, was added to the list in *Sunbeam Products, Inc. v. West*

***Bend Co.***, 123 F.3d 246, 257 (5th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 1795 (1998).  And, in that case, our court held: "In determining the likelihood of confusion, the district court must apply the 'digits of confusion' test".  ***Id***.

Rolex introduced evidence that Meece has used three different marks on his non-genuine bracelets.  The first was a five-prong crown, very similar to the Rolex "Crown Device".  He discontinued using that mark in 1988, and sold fewer than 50 bracelets bearing it.  The second mark was a three-prong crown.  After an objection by Rolex, Meece discontinued using that mark two years prior to trial, and did not sell any bracelets bearing it.  Meece's current mark is a four-sided figure, with no prongs; but, it is wider at the top than at the bottom and resembles the shape or outline of a crown.  The border is smooth and the center has a matte finish.

Rolex's expert testified that the similarity of the Meece and Rolex marks should be evaluated under the following guidelines: (1) the designs should not be compared side by side, because that is not the context in which they would be seen by consumers; (2) consumer recollection of the Rolex "Crown Device" is imperfect; and (3) the overall context of the design, including its use on bracelets that look identical to Rolex bracelets, and its placement in the same location on the bracelets, should be considered. Rolex's expert considered Meece's current mark likely to cause confusion with the Rolex "Crown Device".

Rolex notes that the same design used by Meece was the subject of an action brought by Rolex against one of Meece's customers. In *Rolex Watch, U.S.A., Inc. v. Michel Co.*, No. 96-0805 (S.D. Cal. 1997) (unpublished), the court found that the "trapezoidal" design was likely to cause confusion with the Rolex "Crown Device", stating that "the overall impression created by Defendants' imitation crown is likely to cause confusion among prospective purchasers who carry an imperfect recollection of the Rolex crown".

But, in the case at hand, the district court found that Meece's current mark "is not sufficiently similar to be likely to cause confusion with the Rolex mark". Although the marks are similar in shape and size, they are not identical. Meece's mark is a four-sided figure, the top of which is wider than the bottom. It has a smooth border, and a matte finish in the center. As stated, the Rolex "Crown Device" is a five-pronged crown, with a ball at the top of each prong, and an oval underneath, depicting the base of the crown. However, "similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features". *Moore*, 960 F.2d at 490. Meece's mark is placed on the exterior of the clasps of non-genuine bracelets which are very similar to genuine Rolex bracelets; and, it is placed in the same location that the Rolex "Crown Device" is placed on the exterior of the clasps of genuine Rolex bracelets.

Meece contends that, because Rolex purchasers are very sophisticated, they are not likely to confuse his mark with that of Rolex. He also points out that his bracelets are stamped "Made in Italy", and claims that potential purchasers would know that Rolex watches are not made there. But, the "Made in Italy" marking is on the interior of the bracelet clasp. Moreover, even Meece testified that he did *not* know where genuine Rolex bracelets are made, so it seems unlikely that his customers (jewelers) or their customers (ultimate consumers) would be informed by that designation that the bracelets are not genuine.

The district court erred by failing to consider and weigh all of the digits of confusion. Furthermore, it should have considered the factors identified by Rolex's expert in determining whether Meece's mark is confusingly similar to that of Rolex. Accordingly, on remand, the district court should consider, in the light of all of the appropriate factors, whether Meece's mark is likely to cause confusion with the Rolex "Crown Device".

### D.

Rolex acknowledges that Meece is entitled to advise consumers that he is selling replacement parts for Rolex watches; but, it asserts that the district court erred by failing to enjoin Meece's use of Rolex trademarks to identify his non-genuine parts. Specifically, Rolex complains of Meece's use of various Rolex

trademarks ("Submariner", "Oyster", "Presidential Style") in his sales literature to identify his non-genuine parts.

In refusing to enjoin such use, the district court stated:

> There is no principled difference between selling generic or custom bands or bezels made specifically for a Rolex watch from, for example, selling a custom high-performance carbur[e]tor made specifically to fit a Ford Mustang. Common sense indicates that a replacement part must be specifically designed to replace the original part. A part not specifically designed to replace the original part is simply not a replacement part. As long as it is clear to the purchaser that the replacement part is not an authentic Rolex part, ... there is no reason to enjoin [Meece] from stating that the replacement part fits a particular Rolex product.

Rolex apparently concedes as much, but asserts that Meece is not using its trademarks in that manner; instead, according to Rolex, he is illegally using the Rolex trademarks to identify his products.

The district court did not err by refusing to enjoin Meece's use of Rolex trademarks to identify the Rolex products corresponding to his replacement parts. He uses the trademarks in his advertising materials sent to retail jewelers. Those materials adequately disclose that the parts are non-genuine; that Meece is not affiliated with Rolex; and that the addition of those parts to genuine Rolex watches voids the Rolex warranty.

In a footnote, Rolex asserts that, even absent a finding of likely confusion, Meece's use of Rolex marks violates the Texas anti-dilution statute, TEX. BUS. & COM. CODE § 16.29. We refuse to

address this claim, because it is not adequately briefed.  FED. R.
APP. P. 28(a)(6).

### III.

For the foregoing reasons, the judgment is **VACATED** with
respect to the findings that Meece's profits on infringing sales
are *de minimis* and that his mark is not sufficiently similar to be
likely to cause confusion with the Rolex "Crown Device" mark; and
the conclusion that Rolex is not entitled to recover profits and
attorney's fees.  In all other respects, the judgment is **AFFIRMED**.
The case is **REMANDED** for further proceedings consistent with this
opinion.

*AFFIRMED in PART, VACATED in PART, and REMANDED*

JERRY E. SMITH, Circuit Judge, dissenting:

The majority presents a careful and well-researched opinion. I respectfully dissent, however, from the decision to vacate the district court's findings that Meece's profits on infringing sales were *de minimis* and that his mark is not sufficiently similar to be likely to cause confusion with the Rolex "Crown Device" mark, and also to vacate the district court's conclusion that Rolex is not entitled to recover profits and attorney's fees. I would affirm, essentially for the reasons stated by the district court in its comprehensive findings of fact and conclusions of law. As the district court stated, its judgment "attempts to strike an equitable balance that protects the rights of Rolex, yet recognizes the legitimate interest of Meece to provide a valuable service to the public." I would hold that the district court was successful in that attempt.