IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 23, 2008

Charles R. Fulbruge III
Clerk

No. 07-50406

PAULSSON GEOPHYSICAL SERVICES INC

Plaintiff-Appellee

V.

AXEL M SIGMAR; RESERVOIR SYSTEMS INC; SIGMA RESEARCH INC

Defendants-Appellants

Appeal from the United States District Court
for the Western District of Texas

Before GARWOOD, CLEMENT and ELROD, Circuit Judges.

PER CURIAM:

The Appellants appeal the district court's grant of the Appellee's motion for a preliminary injunction. We affirm.

## I. FACTS AND PROCEEDINGS

Plaintiff-Appellee Paulsson Geophysical Services, Inc. ("Paulsson") is a California corporation that provides seismic imaging services to the oil and gas exploration and production industry. It markets a three-dimensional vertical seismic profile service called "MASSIVE 3D VSP" and holds trademarks registered in the United States for both "P/GSI" and "MASSIVE 3D VSP". Defendant-Appellant Axel M. Sigmar is a resident of Texas who is the registered agent for Defendants-Appellants Reservoir Systems, Inc. ("RSI") and Sigma

Research, Inc. ("SRI"), both Texas corporations. Sigmar is also the president of the board of administration for Reservoir Systems Internacional ("RSM"), a Mexican corporation.[1]

In 2000, Paulsson and the Appellants began discussing the possibility of a cooperative business venture. Paulsson knew that Sigmar was in contact with Petroleos Mexicanos ("Pemex") regarding a contract to provide seismic data acquisition services. In order to facilitate discussions between the parties, Paulsson entered into mutual nondisclosure agreements with Sigmar and SRI in March 2000 and March 2004. In March 2005, Paulsson provided RSI with a letter of authority, allowing it to promote Paulsson's MASSIVE 3D VSP services in Mexico. In May 2005, RSI granted all rights under the letter of authority to RSM, but the grant also indicated that it gave RSM the right to "use" Paulsson's technology, not just promote it. The assignment to the Mexican corporation was made in Texas and filed in the Texas Secretary of State's records and certified with an apostille.[2] Although Sigmar and Paulsson later negotiated to amend the letter of authority to permit RSI to promote Paulsson's technology through RSM, the amendment was not finalized. Both before and after issuing the letter of authority, Paulsson specified to the Appellants that the letter did not grant RSI a license to use Paulsson's technology or to commit Paulsson to perform services. On July 24, 2006, RSM and Pemex entered into a contract in which Pemex would receive seismic profiles using Paulsson's MASSIVE 3D VSP technology.

Paulsson later became concerned that the Appellants had obtained the contract with Pemex by offering Paulsson's services even though they had no authority to do so. Paulsson also became concerned about the use of its trademarks because it believed that the Appellants planned to perform the

---

[1] Defendants-Appellants will be collectively referred to as "Appellants."

[2] "[A] standard certification provided under the Hague Convention for authenticating documents used in foreign countries." BLACK'S LAW DICTIONARY 105 (8th ed. 2004).

contract with Pemex by using a different system while still purporting to provide Paulsson's technology.

Paulsson filed suit on December 4, 2006, moving for a temporary restraining order and preliminary injunction to prevent Sigmar, RSI, SRI, and RSM from using Paulsson's trademarks or other proprietary information. Sigmar, RSI, and SRI denied that the court had subject matter jurisdiction over the action in their answer, but they did not move to dismiss the action on that basis. The district court issued a temporary restraining order and granted the motion for a preliminary injunction. On February 23, 2007, the case was reassigned from Judge Yeakel to Judge Sparks. On May 25, 2007, the district court granted RSM's motion to dismiss for lack of personal and subject matter jurisdiction.

Sigmar, RSI, and SRI appeal the district court's grant of Paulsson's motion for a preliminary injunction. They also assert that the district court lacked subject matter jurisdiction.

## II. STANDARDS OF REVIEW

This Court reviews questions of subject matter jurisdiction de novo. Lundeen v. Mineta, 291 F.3d 300, 303 (5th Cir. 2002). "[T]he issue of subject matter jurisdiction may be raised for the first time on appeal." Veldhoen v. U.S. Coast Guard, 35 F.3d 222, 225 (5th Cir. 1994).

With regard to a preliminary injunction,

> [a] district court's grant of a preliminary injunction is reviewed for abuse of discretion. Each of the four elements required to support a preliminary injunction . . . presents a mixed question of fact and law. Findings of fact are reviewed only for clear error; legal conclusions are subject to de novo review. Although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed de novo.

Women's Med. Ctr. of Nw. Houston v. Bell, 248 F.3d 411, 418–19 (5th Cir. 2001) (footnotes omitted). In reviewing a trademark claim, a "finding of a likelihood of confusion is . . . a finding of fact reviewed for clear error." Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 665 (5th Cir. 2000).

## III. DISCUSSION

### A.    Subject Matter Jurisdiction

"[T]he legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears." Steele v. Bulova Watch Co., 344 U.S. 280, 285 (1952). In Bulova, the Supreme Court addressed the issue of whether a district court had "jurisdiction to award relief to an American corporation against acts of trade-mark infringement . . . consummated in a foreign country by a citizen and resident of the United States." Id. at 281. The Court noted "the broad jurisdictional grant in the Lanham Act." Id. at 286. The Act applies to trademark infringement in "commerce" and defines that term as "'all commerce which may lawfully be regulated by Congress." Id. at 284 (quoting 15 U.S.C. § 1127).

Regarding the jurisdictional question before it, the Court concluded that "[w]here . . . there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction." Bulova, 344 U.S. at 289. However, the Court relied in part on the fact that the infringing party's activities "were not confined within the territorial limits of a foreign nation." Id. at 286. The defendant had brought some of the materials used in its infringing activities from the United States to Mexico, and some of the watches he assembled were later found in Texas. Id. at 284–85.

Relying on Bulova, this Court affirmed a district court's assertion of jurisdiction to enjoin trademark infringement in Saudi Arabia after analyzing the following:

4

> [C]ertain factors are relevant in determining whether the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction. These include the citizenship of the defendant, the effect on United States commerce, and the existence of a conflict with foreign law. The absence of any one of these is not dispositive. Nor should a court limit its inquiry exclusively to these considerations. Rather, these factors will necessarily be the primary elements in any balancing analysis.

Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n, 701 F.2d 408, 414 (5th Cir. 1983) (internal citation and footnotes omitted).[3] Still, this Court noted that "some effect" on United States commerce, as opposed to a substantial effect, may be sufficient for that factor. Id. at 414 n.8. It determined that the infringing party's sales in Saudia Arabia had "more than an insignificant effect on United States commerce." Id. at 414. However, like the Bulova Court, this Court also emphasized the importance of the fact that the infringing party was a United States corporation. Id. at 416. It noted, "[n]o principle of international law bars the United States from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations are not infringed." Id. (internal quotations omitted).

The district court did not address the issue of subject matter jurisdiction over Sigmar, RSI, and SRI in detail. In its opinion dismissing the suit against RSM for lack of personal and subject matter jurisdiction, it noted that it had jurisdiction over Lanham Act claims against United States citizens. The Appellants do not dispute that they are citizens of the United States. Nor do they assert that the trademarks at issue are protected by Mexican law. Their argument rests solely on their contention that Paulsson failed to show any effect on United States commerce.

---

[3] This Court recently reaffirmed these factors in a case with similar facts to American Rice. See Am. Rice, Inc. v. Producers Rice Mill, Inc., 518 F.3d 321, 327–28 (5th Cir. 2008).

The language of Bulova and American Rice suggests that a district court may have jurisdiction over Lanham Act claims against United States citizens properly before it where there is no interference with a foreign nation's sovereignty, regardless of the effect on United States commerce. However, the facts of those cases involved the movement of goods that had some effect on United States commerce. Here, there is no need to decide what is the smallest "effect" on United States commerce that is necessary to sustain a court's jurisdiction over United States citizens committing trademark infringement in a foreign country, because the Appellants' activities in this case rose to the level of the infringing parties in Bulova and American Rice.

The three U.S. Appellants and the U.S. Appellee were all engaged in commercial activity in the United States. The two trademarks at issue were registered in the United States. RSI received a letter of authority from Paulsson while conducting commercial activity in the United States. It then executed, within the United States, an assignment of those rights to a Mexican corporation, RSM. In that assignment, Sigmar acknowledged on RSI's behalf that, although RSM would be the prime contractor with Pemex, RSI would be acting as a subcontractor using Paulsson's and SRI's proprietary technologies. RSI even availed itself of the facilities of the State of Texas to record the assignment and obtain an apostille—which is defined above—so that the document could be used in Mexico. The assignment clearly was transported or transmitted across the border to Mexico where RSM conducted negotiations with Pemex.

On June 30, 2005, RSI entered into a services agreement with RSM to provide oil exploration activities under RSM's contract with Pemex.[4] The agreement claimed that RSI would use SRI's technology. Sigmar signed the

---

[4] The record only shows one contract between RSM and Pemex, although it was not signed until July 24, 2006.

services agreement on behalf of both RSI and RSM. On the same day, in furtherance of RSM's contract with Pemex, RSI and RSM entered into an agreement to sublicense RSM to use the "Base Technology, Seismic Technology, and Equipment" that RSI was licensed by SRI to use. Sigmar signed the sublicense agreement on behalf of both RSI and RSM. Based upon RSM's response to interrogatories, the services agreement and the sublicensing agreement were the only contracts between RSI and RSM.

Although the above agreements did not mention Paulsson's technology or trademarks, the record indicates that its technology and marks were central to RSI's and RSM's future work with Pemex. RSM's "business information" document dated July 11, 2005, expressed that it would provide services to Pemex utilizing "Massive 3D VSP®" equipment and that RSI had an exclusive agreement to provide the "Massive 3D VSP® in Mexico." The document also explained that "[i]n order to provide services to Pemex, RSI ha[d] entered into a variety of arrangements with specialized service providers, including [Paulsson and SRI]." Sigmar testified that the purpose of the business information document was to obtain financing for RSM.

He pursued such financing from a corporation in New York. In an agreement dated July 16, 2005, that corporation agreed to obtain $30,000,000 in financing for "RSI/RSM." The funding would be guaranteed by a lien on assets and "an assignment of all rights related to the use of patents related to seismic imaging technology held by RSI and granted to RSM in Mexico." Sigmar signed the agreement on behalf of both RSM and RSI. The financing from that agreement, however, was never obtained.

On approximately May 8, 2006, RSI entered into a loan agreement and subsequently received $5,000,000 from a Delaware corporation with its principal place of business in Texas. Based upon e-mails from the Delaware corporation

to RSM officials, it is clear that the financing was for RSI and RSM in Mexico. RSI was subsequently sued in Harris County, Texas for failing to repay the loan.

On July 24, 2006, RSM entered into a contract with Pemex titled "Work to obtain and process data from massive 3D seismic vertical profiles in the marine or inland areas, using MASSIVE 3D VSP technology, for the assets of [Pemex]." The total amount of the contract was $29,401,098.16.

RSI subsequently chartered a vessel on October 13, 2006 from a different Delaware corporation with its principal place of business in Texas. The vessel was to be delivered in Texas City, Texas for operations in "Mexico (Gulf of Mexico)" and the first thirty days of the charter were to cost $1,590,000. In the agreement, various obligations of the vessel's owner were extended to RSM and Pemex, which were included as RSI's customers. The vessel owner subsequently filed suit against RSI for failing to pay for extensions of the charter.

During 2006, RSM transferred $7,120,086.56 to RSI.

These significant contracts and financial transactions were clearly related to RSI's support of RSM's contract to use MASSIVE 3D VSP technology. Based upon our review of the record, we disagree with the Appellants' confident assertion in their brief that "there is no evidence showing any effect on United States commerce." These activities not only had some effect; they had a substantial effect on United States commerce. Although not necessarily violations of the Lanham Act, these activities were all "essential steps in the course of business consummated abroad," the misuse of Paulsson's trademarks. Bulova, 344 U.S. at 287. Therefore, we hold that the district court had subject matter jurisdiction over the Lanham Act claims against the Appellants.

B. Preliminary Injunction

A court should issue a preliminary injunction if the movant shows

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any

harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

Speaks v. Kruse, 445 F.3d 396, 399–400 (5th Cir. 2006) (internal quotations omitted). The Lanham Act makes liable, "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A).

To succeed in a trademark infringement claim, a party must first show that it has a protectable right in the mark and, second, show that there is a likelihood of confusion between the marks. See Security Ctr., Ltd. v. First Nat'l Security Ctrs., 75 F.2d 1295, 1298 (5th Cir. 1985). To obtain an injunction for trademark infringement, a party

> [f]irst . . . must prove that the name he seeks to protect is eligible for protection. He must then prove he is the senior user. . . . [H]e must then show a likelihood of confusion between his mark and that of the defendant. Finally, . . . he must show that the likelihood of confusion will actually cause him irreparable injury for which there is no adequate legal remedy.

Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex., 909 F.2d 839, 844 (5th Cir. 1990).

With regard to the preliminary injunction element of establishing a substantial likelihood of success on the merits, the Appellants do not dispute the marks' eligibility for protection or that Paulsson is the senior user. They only argue that the district court erred in finding that there was a likelihood of confusion. They also claim that the court did not make a finding regarding the irreparable injury element, and, if it did, it was in error.

(1)    Likelihood of Success

In determining whether a likelihood of confusion exists, this court considers the following nonexhaustive list of factors: (1) the type of trademark allegedly infringed, (2) the similarity between the

two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these "digits of confusion."

Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 194 (5th Cir. 1998) (citation omitted). This Court has also added "[a]n eighth factor, the degree of care employed by consumers." Rolex Watch USA, Inc. v. Meece, 158 F.3d 816, 830 (5th Cir. 1998).

The Appellants claim that the district court failed to consider the "digits of confusion" in making its decision to grant the preliminary injunction. They also claim the district court erred in granting the injunction because of the lack of confusion over the use of the marks and the unlikelihood of potential confusion.

a. "Digits of Confusion" Analysis

To justify their claim that the district court erred by failing to consider the digits of confusion, the Appellants rely in part on the admonition that "the district court must apply the 'digits of confusion' test" in Sunbeam Products, Inc. v. West Bend Co., 123 F.3d 246, 257 (5th Cir. 1997), abrogated on other grounds by TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23 (2001). The district court found that it "need not engage in an analysis of each of the 'digits of confusion' listed above where, as here, Defendants RSI and RSM employed [Paulsson's] exact marks in its dealings with Pemex." The district court relied on Microsoft Corp. v. Software Wholesale Club, Inc., 129 F. Supp. 2d 995, 1007 n.11 (S.D. Tex. 2000), in which the court found that where a counterfeit mark was used, confusion was clear. We disagree with the Appellants' assertion that the district court did not conduct a digits of confusion analysis. It clearly did.

The Appellants further argue that the district court erred by not analyzing each of the digits. They rely on language from Rolex Watch in which this Court reversed a district court's partial denial of an injunction because it "fail[ed] to consider and weigh all of the digits of confusion." 158 F.3d at 831. The Appellants' reliance on Rolex Watch is misplaced, however, because it is distinguishable. The marks at issue in that case were similar, not the exact marks as the district court found here. Id. at 830. Thus, the marks in Rolex Watch required greater analysis. Also, this Court noted a variety of problems with the district court's analysis in Rolex Watch. It determined that the district court should have considered factors identified by Rolex's expert in determining whether there was a likelihood of confusion. Id. at 831. The same design had been found to be likely to cause confusion in a different case. Id. at 830. As a result, this Court's holding in Rolex Watch that "[t]he district court erred by failing to consider and weigh all of the digits of confusion," is inapplicable to the facts of this case where the Appellants used the exact same mark.

Also, the Appellants' argument that we should adopt such a reading of Rolex Watch conflicts with this Court's description of the digits of confusion. "The digits are a flexible and nonexhaustive list. They do not apply mechanically to every case and can serve only as guides, not as an exact calculus." Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477, 485 (5th Cir. 2004). Because the Appellants used Paulsson's exact marks, we hold that the district court did not err as a matter of law in its digits of confusion analysis.

### b.    Likelihood of Confusion

To determine if there was a likelihood of confusion, the district court correctly used the standard "more than a mere possibility of confusion," relying on Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 543 (5th Cir. 1998), abrogated on other grounds by TrafFix Devices, Inc., 532 U.S. at 32–33. It found

11

that there was a likelihood of confusion because Pemex had recently required the use of MASSIVE 3D VSP technology in the performance of services, despite a document showing that it had accepted different technology for one oil well. The court also found that Sigmar's refusal to assure that the use of Paulsson's marks would not occur again indicated a continued likelihood of confusion. It determined that the small community of potential customers may be confused about who was providing services to Pemex.

At oral argument, the Appellants pointed to documents which they claimed showed that Pemex understood that it not receiving MASSIVE 3D VSP technology because it accepted Sigmar's proposal to use digital sensors as opposed to Paulsson's analog sensors. We agree that Pemex understood that it was receiving services using different sensors. However, despite that understanding, Pemex continued to use the term "Massive 3D VSP" to describe the services it would receive in an October 14, 2006 document. We also agree with the district court that this confusion was aggravated by the fact that the object of the RSM contract with Pemex continued to be "[w]ork to obtain and process data from massive 3D seismic vertical profiles in the marine or inland areas, using MASSIVE 3D VSP technology, for the assets of [Pemex]." Despite the use of different sensors, not only was there a likelihood that Pemex was confused as to whether the technology used in combination with new sensors was MASSIVE 3D VSP technology, but the record shows that Pemex was actually confused. Pemex continued to label those services under the rubric of Paulsson's MASSIVE 3D VSP trademark.

Sigmar testified in the district court about the October 14, 2006 document which indicated Pemex's confusion. He explained Pemex's use of the MASSIVE 3D VSP technology mark in the letter, stating that Pemex was simply using the term "Massive" to describe "just a lot of shots to a large array." His testimony is contradicted by the document itself, particularly since the word "Massive"

("Masivo" in the Spanish original) was capitalized, indicating it referred specifically to the trademark. Sigmar's explanation is, at best, strained, and suggests that the district court had a substantial basis to reject his testimony in general, as well as his specific testimony that he had confirmed to Pemex that he and his corporations were no longer using MASSIVE 3D VSP technology.

Considering Pemex's confusion and Sigmar's testimony, we hold that the district court did not clearly err in finding a likelihood of confusion.

### (2) Irreparable Injury

> Federal courts have long recognized that, when the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction. . . . [A]n injury is irreparable only if it cannot be undone through monetary remedies. . . . The absence of an available remedy by which the movant can later recover monetary damages . . . may . . . be sufficient to show irreparable injury.

Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472–73 (5th Cir. 1985) (internal quotations and footnotes omitted).

At least one district court in the Fifth Circuit has held that in a trademark case, "[w]hen a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services." Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C., 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999). This Court has avoided "expressly adopting this presumption of irreparable injury." S. Monorail Co. v. Robbins & Myers, Inc., 666 F.2d 185, 188 (5th Cir. Unit B 1982).

Many other circuits, however, have addressed this issue and held that a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case. See Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 129 (2d Cir. 2004); Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 902 (7th Cir.

2001); GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1209 (9th Cir. 2000); Circuit City Stores, Inc. v. CarMax, Inc., 165 F.3d 1047, 1056 (6th Cir. 1999); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998); Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998); Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 640 (1st Cir. 1992); Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753 n.7 (8th Cir. 1980).

Since oral argument, the Eleventh Circuit has noted that "a recent U.S. Supreme Court case calls into question whether courts may presume irreparable harm merely because a plaintiff in an intellectual property case has demonstrated a likelihood of success on the merits." N. Am. Med. Corp. v. Axion Worldwide, Inc., No. 07-11574, 2008 WL 918411, at *12 (11th Cir. Apr. 7, 2008) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)). In eBay, the Court reversed the Federal Circuit for applying a categorical rule to permanent injunctions in a Patent Act case. 547 U.S. at 393–94. It concluded that "neither court below correctly applied the traditional four-factor framework that governs the award of injunctive relief." Id. at 394.

In its findings, the district court properly cited the four requirements that needed to be met before it could issue a preliminary injunction, including the substantial threat of irreparable injury.[5] After devoting the bulk of its analysis to its finding of a likelihood of confusion, the court also found that the Appellants would suffer little harm from an injunction. The court further found that

> [t]here is a likelihood of harm to [Paulsson] in the case of Defendants' further use of the marks because of the possible injury to the company's goodwill should the Pemex Contract not be performed to Pemex's satisfaction, or should the seismic-profiling

---

[5] The court expressly stated each of the four elements which issuance of a "preliminary injunction" requires that "the movant demonstrate[]," including "(2) a substantial threat that the movant will suffer irreparable injury if the injunctive relief is denied."

> marketplace believe that [Paulsson] is sponsoring the services used to perform the Pemex Contract in the event that inferior or inappropriate technology and services are used instead.

The district court concluded that Paulsson had "met its burden, having demonstrated that the elements supporting a preliminary injunction apply to this case."

Based upon our reading of the district court's findings, we disagree with the Appellants that the court failed to find a substantial threat of irreparable injury. The district court cited all four factors and concluded that Paulsson had demonstrated that they had all been met. Also, its finding of likelihood of harm to Paulsson, although in the balance-of-harms analysis, was not necessarily limited to that analysis alone. The irreparable injury element is inherently related to the balance-of-harms analysis.

We have no need to decide whether a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case, a difficult question considering the Supreme Court's opinion in eBay. The facts of this case support a finding of a substantial threat of irreparable injury. The value of the Pemex contract was sizeable, over $29,000,000. Paulsson was clearly interested in developing business in Mexico based upon its efforts to have RSI promote its technology there. In addition to the threat to potential business in Mexico, we agree with the district court that the "small community of companies that make up [Paulsson's] potential customers may" have been confused about who was providing services in Mexico under Paulsson's mark. There was a substantial threat to Paulsson's goodwill and the value of its MASSIVE 3D VSP mark in Mexico and throughout its small pool of potential customers, because the Appellants were continuing to use the mark while modifying the technology associated with it. Paulsson had lost control of the quality of the technology that was being associated with its mark. Such damage to Paulsson's goodwill in Mexico and worldwide could not be quantified. Thus, the damage to Paulsson

could not be undone by monetary remedies.  We hold that the district court did not clearly err in finding a substantial threat of irreparable injury to Paulsson if the injunction were not issued.

## IV. CONCLUSION

The district court's grant of Paulsson's motion for a preliminary injunction is AFFIRMED.