IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 15, 2009

Charles R. Fulbruge III
Clerk

No. 08-10248

THE SOUTHERN COMPANY

Plaintiff - Appellee

v.

DAUBEN INC, doing business as Texas International Property Associates

Defendant - Appellant

Appeal from the United States District Court for the
Northern District of Texas, Dallas
No. 3:07-CV-1690

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellant Dauben Inc. appeals the district court's entry of a preliminary injunction barring the company from, among other things, "[r]egistering, transferring, trafficking, using, or maintaining" the domain names sotherncompany.com and southerncopany.com. Plaintiff–Appellee The Southern Company, which holds federal and state trademarks for "SOUTHERN COMPANY" and the domain name southerncompany.com, instituted this action against Dauben Inc. under the Anticybersquatting Consumer Protection Act

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

("ACPA"), 15 U.S.C. § 1125(d). At the outset of the proceedings, Southern Company filed a motion for a preliminary injunction, which the district court granted in an October 22, 2007 order. Dauben Inc. now challenges the district court's findings that (1) Southern Company was likely to succeed on the merits because Dauben Inc. registered the domain names with a bad faith intent to profit and (2) there existed a substantial threat that Southern Company would suffer irreparable injury without the preliminary injunction. Because the district court conducted an incomplete analysis in its findings of a likelihood of success on the merits and a substantial threat of irreparable injury, we conclude that the district court abused its discretion in granting the preliminary injunction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

The Southern Company ("Southern") is a Fortune 500 company that provides energy-related services to consumers throughout the southern United States. It holds the federal, incontestable[1] mark "SOUTHERN COMPANY" and is the registrant of the domain name southerncompany.com.

Dauben Inc. ("Dauben"), a Texas corporation, is the listed registrant of nearly 635,000 domain names. The two challenged domain names, sotherncompany.com and southerncopany.com, are linked to a website that only provides pay-per-click advertising—when an Internet user enters either domain

---

[1] A mark becomes "incontestable" when "such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce." 15 U.S.C. § 1065; *see also Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 n.25 (5th Cir. 2008). An incontestable mark "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark . . . and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

name in her browser, she is directed to a webpage that lists links to the websites of paying advertisers. If the user clicks on any of these links, then the advertiser pays a fee to the website. *See NetQuote, Inc. v. Byrd*, No. 07-CV-00630-DME-MEH, 2008 WL 2552871, at *13 (D. Colo. June 17, 2008) (quoting the defendant's description of pay-per-click advertising "whereby 'the advertiser pays each time an internet user "clicks" on the advertiser's ad and is taken to a page on the advertiser's website'"). The advertising links are related to, among other things, real estate and employment companies in the southern United States. The only connection between this webpage and Southern is that the webpage contains an advertisement link to Georgia Power, a Southern subsidiary.

## B.    Procedural Background

When Southern learned of Dauben's use of the two contested domain names, it filed an action under the Uniform Domain Name Dispute Resolution Policy (the "UDRP") with a World Intellectual Property Organization (the "WIPO") arbitration panel on May 25, 2007. On August 24, 2007, the WIPO panel ruled in favor of Southern and ordered Dauben to transfer the domain names to Southern. *See Southern Co. v. Tex. Int'l Prop. Assocs.*, Case No. D2007-0773 (WIPO Aug. 24, 2007), http://www.wipo.int/amc/en/domains/decisions/html/2007/d2007-0773.html. Before the WIPO panel directed Dauben to transfer the domain names, however, Dauben filed suit against Southern in a Dallas County justice of the peace court on July 23, 2007. Doing so prevented the transfer of the domain names because the UDRP's terms provide that if a lawsuit has been commenced concerning the arbitrated domain names, then such a transfer will not be completed until that

3

suit has been resolved. *See* Internet Corp. for Assigned Names and Numbers, UDRP ¶ 4(k) (Oct. 24, 1999), http://www.icann.org/en/udrp/udrp-policy-24oct99.htm. In the state court action, a jury returned a verdict in favor of Dauben on October 30, 2007.

Before the state court jury returned its verdict, Southern filed the current claim in the United States District Court for the Northern District of Texas on October 5, 2007, alleging that Dauben's "typosquatting"[2] violates ACPA. Simultaneously, Southern filed a motion for preliminary injunction seeking to prevent Dauben's continued use of the domain names. Over Dauben's objections,[3] the district court granted the motion in an October 22, 2007 order by concluding that all four preliminary injunction prerequisites existed and therefore enjoined Dauben from "[r]egistering, transferring, trafficking, using, or maintaining the registration of the domain names, SOTHERNCOMPANY.COM and SOUTHERNCOPANY.COM, or any other domain name that is identical or confusingly similar to any of Plaintiff's SOUTHERN COMPANY marks." (Order Granting Prelim. Inj. 7.)

---

[2] Typosquatting is, generally speaking, the "registering [of] domain names that are intentional misspellings of distinctive or famous names." *See Shields v. Zuccarini*, 254 F.3d 476, 483 (3d Cir. 2001); *see also Green v. Fornario*, 486 F.3d 100, 103 n.5 (3d Cir. 2007) (describing typosquatting as a "subgenera of cybersquatting" that "involves registering a domain name that is but a letter or two off from a distinctive mark"); Andy Johnson-Laird, *Looking Forward, Legislating Backward?*, 4 J. SMALL & EMERGING BUS. L. 95, 101 (2000) (explaining typosquatting as the "register[ing][of] mistyped variants of popular domain names to catch the electronic crumbs dropped by careless web surfers").

[3] In its response to Southern's motion, Dauben argued, among other things, that its use of the domain names fell within the definition of the fair use defense to trademark infringement found in 15 U.S.C. § 1115(b)(4).

4

In response, Dauben filed a motion for reconsideration. In it, Dauben argued that its employment of the domain names constituted a fair use by pointing to ACPA's safe harbor provision, which states: "Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). According to Dauben, its use fell within this safe harbor because it employed the words "southern" and "company" in their descriptive sense by providing pay-per-click links to companies located in the South, a use allegedly comparable to a yellow pages phone book. Second, Dauben averred that the district court failed to consider the nine factors listed in 15 U.S.C. § 1125(d)(1)(B)(i) to determine whether Dauben possessed a bad faith intent to profit from the domain names and instead improperly relied on the WIPO arbitration panel's reasoning. And third, Dauben asserted that the district court incorrectly presumed the existence of a threat of irreparable injury based on its finding a likelihood of confusion, which in turn was impermissibly based on the court's finding the domain names confusingly similar to Southern's mark. For Southern's part, it countered that Dauben is not making fair use of common or descriptive words because the misspelled "sothern" and "copany" are not actual words. Southern further claimed that a majority of 15 U.S.C. § 1125(d)(1)(B)(i)'s factors support a finding of bad faith. Finally, Southern did not address Dauben's assertion that the district court incorrectly determined that a substantial threat of irreparable injury exists.

In denying Dauben's motion for reconsideration on February 14, 2008, the district court rebuffed all of Dauben's arguments. First, although acknowledging

that Dauben raised the applicability of ACPA's safe harbor, the district court neglected to address this provision anywhere in its analysis. Second, it dismissed Dauben's claim that the court failed to consider ACPA's bad faith factors because "[t]he most important grounds for finding bad faith 'are the unique circumstances of the case, which do not fit neatly into specific factors enumerated by Congress but may nevertheless be considered under the statute.'" (Order Den. Mot. for Recons. 4 (quoting *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir. 2000)).) And third, the court stated that it correctly concluded that Southern would suffer irreparable injury were the preliminary injunction not granted.

Subsequently, Dauben filed this timely appeal, and while this appeal was pending, consideration of the merits continued below. On April 18, 2008, both Dauben and Southern filed motions for summary judgment. The district court granted summary judgment in Southern's favor on August 11, 2008. To structure the appropriate remedy, the district court sought supplemental briefing, which it received on September 15, 2008. Since then, however, the court has yet to issue its final judgment and remedy. Based on the success of its motion for summary judgment, Southern filed with this court a motion to declare the appeal moot, which has been carried with the case.

## II.  DISCUSSION

We first address Southern's motion to declare the appeal moot. After denying the motion, we then turn to the consideration of the district court's order granting the preliminary injunction.

## A.    Dauben's Appeal Is Not Moot

6

Dauben's appeal from the district court's grant of a preliminary injunction is not moot because, despite the district court's summary judgment in favor of Southern, the court has yet to issue a final judgment and permanent injunction.

As Southern recognizes in its motion, "'[o]nce an order granting a permanent injunction is entered, the order granting the preliminary injunction is merged with it, and an appeal is proper only from the order granting the permanent injunction.'" (Mot. to Declare Appeal Moot 1 (quoting *La. World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1038 (5th Cir. 1984)); *see also FTC v. Assail, Inc.*, 98 F. App'x 316, 317 (5th Cir. 2004) ("While [appellant]'s appeal was pending, the district court converted the preliminary injunction into a permanent injunction and entered a final judgment. The district court's grant of a permanent injunction rendered this particular appeal [concerning the preliminary injunction] moot.").) Here, however, the district court has not entered a permanent injunction or a final judgment despite having decided this case's merits. While the district court found that "injunctive relief and statutory damages are appropriate," it also stated that "[t]hose remedies will be included in the final judgment *when it issues*." (Order Granting Summ. J. 15 (emphasis added).) This language makes clear that the court's order did not impose a permanent injunction and that such relief will come along at some time in the future. We are not persuaded by Southern's claim that the district court's stated intention to grant a permanent injunction in the future equates to the actual issuance of such a remedy. Additionally, as Dauben contends, the exact language of the permanent injunction is unknown and may vary from the language of the preliminary injunction. With a proper controversy before us, we now turn to Dauben's appeal from the order granting the preliminary injunction.

7

**B.   The Preliminary Injunction Should Be Vacated**

We conclude that the district court abused its discretion by conducting an incomplete analysis of Southern's likelihood to succeed on the merits and of the existence of a substantial threat of irreparable injury to Southern absent the preliminary injunction.

"A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).  The required four factors are: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause [the] defendant[]; and (4) that the injunction will not disserve the public interest." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999).  The ultimate decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 306 (5th Cir. 2008); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998) ("[T]he ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion . . . .").  An abuse of discretion occurs when a district court "(1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003).

Here, Dauben's first two arguments center on the district court's conclusion that Southern is likely to succeed on the merits.  Dauben's final argument focuses on the court's determination that there exists a substantial

threat that Southern will suffer irreparable injury if the preliminary injunction is not granted.[4] We address these arguments in turn.

### 1. Likelihood Of Success On The Merits

In order to prevail on the merits of an ACPA claim, Southern must show that (1) its mark "is a distinctive or famous mark entitled to protection"; (2) Dauben's "domain names are 'identical or confusingly similar to' [Southern]'s mark"; and (3) Dauben "registered the domain names with the bad faith intent to profit from them." *See Shields*, 254 F.3d at 482 (quoting 15 U.S.C. § 1125(d)(1)(A)).[5] Dauben's arguments focus on the district court's finding of bad faith intent to profit.[6]

The statute sets forth a nonexhaustive list of nine factors for the court to consider in determining whether a defendant registered a domain name with a

---

[4] Dauben's reply brief raises arguments concerning the remaining two preliminary injunction requirements, but its initial brief only addressed the two factors described in the text. Therefore, we do not address the arguments concerning the third and fourth factors in the preliminary injunction analysis. *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) ("Arguments raised for the first time in a reply brief . . . are waived.").

[5] Section 1125(d)(1)(A) provides:
A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person
(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
(ii) registers, traffics in, or uses a domain name that—
        (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

[6] In its reply brief, Dauben additionally challenges the district court's conclusion that Southern's mark is entitled to protection; accordingly, Dauben has abandoned this argument on appeal by failing to raise it in the initial brief. *See Jackson*, 426 F.3d at 304 n.2.

bad faith intent to profit.[7]  *See* 15 U.S.C. § 1125(d)(1)(B)(i) ("In determining whether a [defendant] has a bad faith intent described under subparagraph (a), a court may consider factors such as, but not limited to [the nine listed factors] . . . ."); *Shields*, 254 F.3d at 484 ("Section 1125(d)(1)(B)(i) provides a non-exhaustive list of nine factors . . . to consider when making this determination.").

---

[7] These factors are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the [defendant] or a name that is otherwise commonly used to identify that [defendant];

(III) the [defendant]'s prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the [defendant]'s bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the [defendant]'s intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the [defendant]'s offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the [defendant]'s prior conduct indicating a pattern of such conduct;

(VII) the [defendant]'s provision of material and misleading false contact information when applying for the registration of the domain name, the [defendant]'s intentional failure to maintain accurate contact information, or the [defendant]'s prior conduct indicating a pattern of such conduct;

(VIII) the [defendant]'s registration or acquisition of multiple domain names which the [defendant] knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the [defendant]'s domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

Additionally, there can be no bad faith intent where ACPA's fair use safe harbor applies: "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the [defendant] believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii); *see also E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 275 (5th Cir. 2002). Fair use is defined as "a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C. § 1115(b)(4).

In finding Dauben's bad faith intent, the district court stated:

[I]t is clear to the Court that [Dauben] adopted the SOUTHERN COMPANY [m]ark and domain name, so as to divert mistyping Internet users looking for [Southern]'s website to [Dauben]'s sites, where [Dauben] gets paid every time a user clicks on a hyperlink. In addition, the Court finds the WIPO arbitration panel's finding of bad faith in this case persuasive.

(Order Granting Prelim. Inj. 5.) In response to Dauben's assertion that it failed to apply ACPA's factors and that it erroneously relied on the WIPO panel, the district court wrote: "The most important grounds for finding bad faith 'are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute.'" (Order Den. Mot. for Recons. 4 (quoting *Sporty's Farm*, 202 F.3d at 499).)

In challenging the district court's finding of bad faith, Dauben first argues that the district court erred by failing to consider all of ACPA's factors. We decline to impose such a formalistic requirement. *See Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001) ("We need not, however, march through the nine factors seriatim because the ACPA itself notes

11

that use of the listed criteria is permissive.").[8] "'The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by bad faith intent to profit.'" *Lamparello v. Falwell*, 420 F.3d 309, 319–20 (4th Cir. 2005) (quoting *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004)). Relatedly, Dauben argues that the district court erred by relying on the WIPO arbitration panel's finding of bad faith and on a reference to the case's unspecified "unique circumstances." Dauben's arguments point to what is an abbreviated consideration by the district court of the criteria for finding a bad faith intent to profit. First, while referring to a WIPO panel may not, itself, be error, courts should recognize that the UDRP standards applied by such a panel often do not mirror the standards under ACPA. *See Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 626 (4th Cir. 2003) ("[B]ecause a UDRP decision is susceptible of being grounded on principles foreign or hostile to American law, the ACPA authorizes reversing a[n] [arbitration] panel decision if such a result is called for by application of the Lanham Act."); *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 28 (1st Cir. 2001) ("[A] federal court's interpretation of the ACPA supplants a WIPO panel's interpretation of the UDRP . . . ."). Second, just as ACPA's list of factors is no substitute for careful thinking about whether bad

---

[8] Our doing so, however, should not be construed as an invitation to omit consideration of these factors in the future, and we note that many district courts consider the factors in deciding whether or not to grant a preliminary injunction under ACPA. *See, e.g.*, *Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 440–43 (E.D.N.Y. 2008) ("The ACPA lists nine factors to assist courts in determining whether a person has a bad faith intent to profit from the use of a mark." (footnote omitted)); *E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 519 (S.D.N.Y. 2008); *Verizon Cal. Inc. v. Navigation Catalyst Sys., Inc.*, 568 F. Supp. 2d 1088, 1095–97 (C.D. Cal. 2008); *Fairbanks Capital Corp. v. Kenney*, 303 F. Supp. 2d 583, 594–95 (D. Md. 2003).

faith exists, so too is a reference to a case's unique circumstances without any explanation of what those circumstances are, let alone how they evidence bad faith. A court would be best served by considering the existence of bad faith in light of ACPA's guiding factors and by describing, where applicable, what additional circumstances demonstrate bad faith, particularly in light of the extraordinary nature of the preliminary injunction remedy. While the district court here failed to do that, its stated reasoning in concluding that bad faith exists is arguably encompassed in one or more of ACPA's factors; thus, we would be hard pressed to conclude that the court abused its discretion based only on this argument. But, Dauben's next challenge to the method of the court's bad faith analysis points up a further problem in the district court's conclusion.

Dauben secondly argues that the district court abused its discretion by omitting any consideration of ACPA's fair use provision, which affects the bad faith finding, and we agree.[9] Though ACPA explicitly provides a fair use safe harbor, the district court made no reference to this portion of ACPA in its analysis despite recognizing Dauben's invocations of the defense. ACPA's safe harbor provides a narrow berth for fair use arguments, and, on the merits,

_____

[9] Dauben intersperses its fair use arguments with assertions that issuing the preliminary injunction violates its First Amendment rights. Southern counters that Dauben failed to raise the First Amendment arguments with the district court. Regardless of whether these arguments were raised below, we need not consider them separately because, if Dauben's conduct is found to involve a bad faith intent to profit and to not constitute a good faith fair use of Southern's mark, then such conduct will not be protected by the First Amendment. *See Coca-Cola Co. v. Purdy*, 382 F.3d 774, 787 (8th Cir. 2004) ("[T]he record supports the district court's findings that [defendant] registered and used domain names that are identical or confusingly similar to plaintiffs' marks with a bad faith intent to profit . . . . This conduct was not protected by the First Amendment."); *cf. Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 626 (9th Cir. 2003) (stating in a copyright infringement suit that "if the use of the alleged infringer is not fair use, there are no First Amendment prohibitions against granting a preliminary injunction").

13

Dauben's claims may or may not hold up. *See Virtual Works, Inc.*, 238 F.3d at 270 ("A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the Act's safe harbor provision."). Nonetheless, where one is raised, a fair use defense bears on the likelihood of success on the merits. *See, e.g.*, *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (affirming the denial of a preliminary injunction in a copyright infringement action because "the doctrine of fair use still defeats any likelihood of plaintiffs' success on the merits"); *Elvis Presley Enters.*, 349 F.3d at 627 (affirming grant of a preliminary injunction in a copyright infringement action because defendant's fair use arguments were unavailing); *eAccelaration Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1123 (W.D. Wash. 2006) (denying preliminary injunction in a trademark infringement suit because the plaintiff "has not met its burden of demonstrating that there is a likelihood of success on the merits . . . particularly given the strength of [defendant]'s fair use defense"). By failing to analyze this segment of the law pertinent to the parties' claims, the district court abused its discretion.

Southern asserts that Dauben's fair use argument lacks merit because Dauben offered no evidence of "its business or about its intent in registering" the domain names and because Dauben cannot make a fair use of misspelled variations of SOUTHERN COMPANY.[10] As to the former argument, we are unpersuaded because the district court had before it evidence concerning the

---

[10] Southern adds to this contention by arguing that Dauben's use cannot constitute a fair use because it does not offer any good or service and because the phrase "southern company" cannot be a good or service. These arguments essentially concern the merits of Dauben's fair use claim and are more appropriately made to, and addressed by, the district court.

14

content of the websites to which Dauben's domain names linked. As to Southern's latter argument, Dauben's using misspelled variations of "southern" and "company" (that is, "sothern" and "copany") certainly may weaken its fair use argument,[11] but that is a question to be considered in the district court's evaluation of the facts and circumstances surrounding the claim—an evaluation that the court below failed to undertake.

### 2. Irreparable Injury

Dauben next contends that the district court erred in concluding there exists a substantial threat that Southern will suffer irreparable injury were the preliminary injunction denied. In its order granting the preliminary injunction, the court reasoned that this threat exists because "[e]stablishing a strong likelihood of confusion in the consumer's mind 'almost inevitably establishes irreparable harm'" and because "[Southern]'s evidence establishes the danger of confusion and loss of [Southern]'s good will as a result of consumer confusion." (Order Granting Prelim. Inj. 6 (quoting *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2d Cir. 1986)).) In denying Dauben's motion for reconsideration, the district court described the evidence that led to finding a strong likelihood of confusion:

> The Court has already determined that [Dauben]'s utilization of the subject domain names is "identical or confusingly similar to" [Southern]'s mark insofar as the names are actually identical, letter for letter, but for the subtraction of one letter in each domain. The Court does not find it hard to find that a consumer could be

---

[11] Though, misspelled words on the Internet are far from rare. *See* Christopher Rhoads, *What Did U $@y? Online Language Finds Its Voice*, WALL ST. J., Aug. 23, 2007, at A1 (describing "leetspeak," a form of online language purposefully utilizing misspellings where "pwn" means "own," "teh" means "the," and numbers and symbols replace the letters of a word).

15

confused as to the sponsorship of the Defendant's domain names because of their stark similarity to [Southern]'s domain name, thus causing irreparable harm.

(Order Den. Mot. for Recons. 5.) To summarize, the district court found a likelihood of confusion because Dauben's domain names are confusingly similar to Southern's mark and, accordingly, may confuse a consumer as to the sponsorship of the websites linked to by the challenged domain names. This consumer confusion, in turn, threatens irreparable injury to Southern.

The court's determination is flawed for two reasons. First, the likelihood of confusion test in trademark infringement law is different, and more comprehensive, than the test for "confusingly similar" under ACPA.[12] *See N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 66 n.14 (1st Cir. 2001) ("[T]he likelihood of confusion test of trademark infringement is more comprehensive than the identical or confusingly similar requirement of ACPA, as it requires considering factors beyond the facial similarity of the two marks." (internal quotation marks omitted)); *see also Coca-Cola Co.*, 382 F.3d at 783 ("The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement."); *Sporty's Farm*, 202 F.3d at 498

---

[12] The likelihood of confusion standard in trademark infringement claims involves consideration of eight nonexhaustive factors:

(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion.

*Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32–33 (2001). "This Court has also added '[a]n eighth factor, the degree of care employed by consumers.'" *Paulsson Geophysical Servs.* 529 F.3d at 310 (quoting *Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 830 (5th Cir. 1998)).

16

n.11 ("We note that 'confusingly similar' is a different standard from the 'likelihood of confusion' standard for trademark infringement . . . .").[13]

Second, the court failed to describe how Dauben's confusingly similar domain names would injure Southern, let alone do so irreparably. Courts making this finding often describe how the content of a defendant's website threatens injury to the plaintiff. *See, e.g.*, *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (stating that without an injunction "Audi would be irreparably harmed by consumers on [defendant]'s site purchasing counterfeit items, instead of those that were lawfully sold by Audi"); *Coca-Cola Co.*, 382 F.3d at 789 ("The district court did not clearly err in finding that plaintiffs would be irreparably harmed by [defendant]'s continued . . . use of the [confusingly similar] domain names to display pictures of dismembered aborted fetuses and by the links to fundraising appeals that did not originate from the plaintiffs."); *Shields*, 254 F.3d at 486 (concluding that the district court properly determined that a likelihood of confusion threatened irreparable injury because "[plaintiff] does not want his audience trapped in [Defendant]'s sites" by defendant's practice of "mousetrapping"—the trapping of Internet users in a succession of pop-up advertisements). Here, however, the district court pointed only to the likelihood that a consumer might accidentally come across Dauben's websites when seeking Southern's website, but it made no finding bearing on *how* this

---

[13] Because we conclude that the court erred by equating the more comprehensive likelihood of confusion standard with the confusingly similar standard, we need not address the parties' competing claims concerning the effect, if any, *eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2008), may have on presuming the existence of irreparable injury from a finding of a likelihood of confusion. *See Paulsson Geophysical Servs.*, 529 F.3d at 313 ("We have no need to decide whether a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case, a difficult question considering the Supreme Court's opinion in *eBay*.").

navigational miscue might injure Southern. Southern contends that the court properly determined that "[p]laintiff's evidence establishes . . . a significant risk of irreparable injury." However, the court made clear that the only evidence it considered was Dauben's domain names and their similarity to Southern's mark. The court made no finding beyond the text of the domain names—such as the content of Dauben's websites—that suggests Southern may be irreparably harmed. For these two reasons, the district court abused its discretion in its analysis of whether there exists a threat of irreparable injury to Southern.

## C.   Remand Is Unnecessary

Having concluded that the district court abused its discretion in conducting an incomplete analysis of Southern's motion for preliminary injunction, we vacate the court's order. We do not remand the issue for further consideration primarily because the district court sits primed to issue a final judgment and remedy in this action. The district court has decided the merits of this claim in its order granting Southern's summary judgment, and it has the benefit of having received additional briefing on how best to structure the remedy in this case. At oral argument, the parties confirmed that all that remains below is for the district court to issue a final judgment and remedy—the latter likely in the form of a permanent injunction. Because a permanent injunction will supercede the preliminary injunction, we will not delay the proceedings any further by remanding the matter of the preliminary injunction. We further emphasize that our ruling today in no way intimates how this court might view the merits of Southern's claims.

### III. CONCLUSION

For the above reasons, the district court's order granting the preliminary injunction is VACATED. Pending motion DENIED.